UNITED STATES DISTRICT COURT
District of Maine

| | |
|---|---|
| DIEDRE M. DiGIACOMO,<br>　　　　　Plaintiff | Docket No. 1:18-CV-00163-GZS |
| v. | |
| KENNEBEC COUNTY, KENNEBEC COUNTY SHERIFF'S OFFICE, KENNEBEC COUNTY CORRECTIONAL FACILITY, KENNEBEC COUNTY SHERIFF'S OFFICE, CORRECTIONS DIVISION, RANDALL LIBERTY, RYAN REARDON, MARSHA ALEXANDER, CALISTA CAMPBELL, LAURA BRIGGS, JESSICA QUINN, DAN CYR, TERRY YORK, BOB DEVLIN, KENNEBEC COUNTY COMMISSIONERS, PATSY G. CROCKETT, NANCY G. RINES, and GEORGE M. JABAR,<br>　　　　　Defendants | |

### AFFIDAVIT OF DIEDRE M. DiGIACOMO

I, Diedre M. DiGiacomo, being duly sworn and under oath state as follows:

1. I am a married woman and a citizen of the State of Maine;

2. I am 47 years old;

3. I am competent to make this affidavit under oath being of sound mind;

4. I worked with Officer Rocque on the midnight to eight o'clock a.m. shift when I finished my training at Kennebec County Correctional Facility.

5. During my training, I learned about using "officer respect" which I understood to mean that you can approach a fellow officer if they are doing something that you are offended by, let them know that it offends you and ask them to stop the behavior.

6. I tried using "officer respect" with Rocque many times but Rocque continued to make offensive comments and jokes.

7. Rocque made many jokes and comments that I found extremely offensive during my tenure with Kennebec County.

8. When Rocque was making a joke about how many Jews does it take to fill a Volkswagen, I attempted to stop him by telling him I did not want to hear it. Rocque persisted in telling me this "joke" in its entirety. I took this statement to be a reference to the Holocaust and I was extremely offended by it.

9. Rocque was coming out of the supply closet one day and when he could not find any Styrofoam cups, he stated, "What is this, Auschwitz?" I took this to be a reference to the Holocaust and I was extremely offended by it.

10. Officer Grimes witnessed Rocque make the statement "What is this, Auschwitz?" and told Rocque that he could not say things like that at work, that he could get fired for making those types of comments. Rocque said that he was off of his ADHD medication and he agreed that he shouldn't say things like that.

11. I also used "officer respect" when Officer Cipriano made sexual and discriminatory remarks to me. I told Cipriano that his joking was offensive to me and that I did not welcome these jokes.

12. When Cipriano made the comment about a bean flicker, I did not know what it was. He explained that a "bean flicker" is related to the sexual act of cunnilingus upon female genitalia.

13. One day, Officer Nelson started telling a "joke." Nelson stated, "What did Hitler say as he was walking through the concentration camp?" I told Nelson to stop and that I didn't want to hear it. Nelson insisted that it was funny to which I told him again, I don't want to hear it.

Nelson persisted and continued as he made a sweeping motion to his lapel stating, "Get off me Jew." I took Nelson's statement to be a reference to the Holocaust and was extremely offended.

14. I did not want to change my hours to part-time. I didn't have a choice since I made numerous complaints to my supervisors about the sexual harassment, the discrimination, and the hostile work environment I was experiencing at the jail. My health was being adversely affected and I thought that by reducing my hours, I could get some relief but there was never any investigation, no one was ever reprimanded except for Officer Simmons who caused me a back injury, and the behavior continued.

15. I did not know that I could take my grievance to the Union. During many meetings with my superiors, including Cyr and Campbell, my Union Shop Steward was present. I was never advised that I could grieve to the Union.

16. I received a "Right to Sue" letter from the Maine Human Rights Commission pursuant to a request submitted to them by my attorney.

17. I also received a "Right to Sue" letter from the EEOC.

18. I was a member of the Union and had union dues taken from my paychecks.

19. I fulfilled the one-year statutory probationary period on November 4, 2014.

20. The first report of sexual harassment I made was on January 29, 2014 to Sgt. LaChance, who was my immediate supervisor on the 12-8 shift.

21. I reported sexual harassment, discrimination, and hostile work environment in a meeting with Campbell on July 23, 2014.

22. I made a formal, written complaint reporting sexual harassment, discrimination, hostile work environment to Campbell on March 24, 2015.

23. I followed the protocol for reporting sexual harassment, hostile work environment, and retaliation pursuant to her training from Kennebec County.

24. I was never advised by any Kennebec County employee, including York, that an investigation was being conducted.

25. I was never interviewed by any Kennebec County employee, including York, as part of any investigation into her repeated complaints.

26. I expected, as a result of her complaints to supervisors and administrative personnel, that they would protect her, follow policy and procedure to do an investigation, and to take action so that the harassing behavior, discrimination, and hostile work environment would stop.

27. I reported to Sgt. LaChance on January 29, 2014 that Officer Rocque was making inappropriate comments to me. I told Sgt. LaChance that Rocque said, "the only thing that should be making me hard in the shower is you."

28. LaChance told me that he was going to speak with Rocque and note this incident in his log notes.

29. LaChance approached me after he heard there were tensions between Rocque and myself. I told LaChance that I used "officer respect" to advise Rocque that the comment was unwelcome.

30. On January 30, 2014, Officers Nelson and Millet came to the floors to give me a break. I asked Officer Millet to excuse me so that I could heat up my coffee. Nelson made an anti-Semitic comment, which was not the first time he did. I made a personal note to document this.

31. I was approached by Sgt. LaChance on March 6, 2014 who heard that I was keeping notes of sexual and discriminatory comments Rocque made to me that I found offensive. LaChance told me that I either take care of the problem now, if there is one, or let it go. LaChance told

4

me that I could not hold things over people's heads. LaChance never advised me on how to take care of the problem.

32. The notes I created were for the purpose of documenting comments that Rocque and other officers were making that I found offensive. A true copy of some of my handwritten notes is attached hereto as *Plaintiff's Exhibit 20*.

33. In April of 2014, I was moved to the 8 a.m. to 4 p.m. shift. I thought that things would improve since I would no longer be working with Rocque.

34. On May 4, 2014, Rocque also moved to the 8 – 4 shift and he began once again making inappropriate and offensive comments to me.

35. Also working on the 8 – 4 shift at that time was Officer Cipriano.

36. Cipriano also made inappropriate sexual and discriminatory comments, engaged in hazing/pranks, and contributed to the hostile work environment I was suffering in.

37. On June 26, 2014, Officer Underwood told me, "if you had a sexy piece of chocolate like me, you wouldn't be a lesbian."

38. Also on June 26, 2014, Officer Routhier called an inmate a "dick head" to Officer Martinez in my presence.

39. On July 19, 2014, I gave Sgt. LaChance a detailed statement regarding an incident with Underwood who called me a "whiny bitch."

40. I had a meeting with Campbell on July 23, 2014 to appeal a disciplinary action. My Union Shop Steward also attended. During this meeting, I reported to Campbell the comment that Underwood made to me.

41. I appealed the write up because during that time, I was being treated for a rash when, on June 12, 2014, while on duty, my rash became so severe I sought medical attention from the

medical department at the jail while on duty.  The rash turned out to be scabbies which I contracted at the jail.

42. On July 30, 2014, Campbell met with Underwood, myself, and my Union Shop Steward Huard for what Campbell referred to as a "clearing the air meeting."

43. During this meeting, Campbell asked Underwood if I told him to "get off his lazy black ass." Underwood truthfully advised Campbell that I never said that.

44. I complained to Cyr and Gardner that Officer Willhoite was making statements against inmates and about hurting animals which I found offensive.

45. At the end of June, 2014, Officer Willhoite was looking for a particular inmate when I asked him for the inmate's name so that I could try to help him.  When Willhoite gave me the name of the inmate he was looking for, I told him there was no inmate by that name on the floor. Willhoite then gave me another name and said, "who cares all black people look alike."

46. In July of 2014, during my 0800 – 1600 shift, I was relieving Officers Willhoite and Clunie and discussing a recent inmate attempted hanging that I was involved in.  Clunie stated, "well its just a show" and Willhoite stated, "wouldn't have mattered if he died, he's an inmate."

47. On September 26, 2014, I heard Willhoite brag about slamming an inmate into a wall.

48. On September 27, 2014,  I heard Willhoite state that a particular inmate "needs to be shot and put into a foreign jail."

49. I used "officer respect" and verbally asked Willhoite not to speak about inmates in this manner several times.

50.  On September 28, 2014 at 0905 hours, I observed Willhoite intentionally agitating an inmate by calling him the name "Texiera."  The inmate told Willhoite several times not to call him that but Willhoite kept taunting him.

51. In March 2015, when Corporal Gardner pulled the diaper prank, I found it extremely offensive and inappropriate.

52. On March 24, 2015 at 11:27 a.m., Rocque made reference to Stonier's crotch to me while we were in control and observing the cameras.

53. On March 29, 2015 at 1300 hours, Officer Willey stated to me, "send the homos up" when she was referring to the kitchen trusties (inmates).

54. At some point in March of 2015, Cipriano licked another officer's arm. I did not witness this but Cipriano came over to me shortly thereafter and was laughing and said, "I just licked a lesbian." I took this comment as highly inappropriate.

55. On April 25, 2015, I made a statement to report to Gardner that Corporal McLean announced over the loud speaker in a joking yet offensive way "Simmons don't try to hurt any officers today." I took this as a reference to the incident where I was hurt by Simmons startling me in the stair case and retaliatory for reporting the hostile work environment.

56. McLean made this announcement while other officers could hear, and I was singled out, targeted, and offended.

57. When Cipriano squeezed toothpaste into a blue rag so that it would simulate semen as though an inmate masturbated on the rag, he presented it to me and stated, "look what I found in a cell."

58. I was frequently mocked for my religious beliefs by multiple officers who would add a Jewish phonetic pronouncement to words I was using. This occurred the entire time I worked at the jail.

59. I was also the victim of jump-scares because other officers thought it was funny that I had a significant startle reflex.

60. This put me at risk for my safety since my reaction was often to jump backwards.  It also put me at risk with the inmate population since inmates could easily overtake me if they became aware of my startle reflex.  This was a significant worry for me.

61. I was jump-scared by multiple different officers on a weekly basis.

62. In July of 2014, I complained to Briggs about the situation with Rocque not improving.  I told Briggs that Rocque was still making inappropriate statements to me in regards to my sexuality and my being Jewish.

63. I made numerous reports to Cyr, my immediate supervisor on the 8 – 4 shift, that I was being sexually harassed, that I was offended by the "jokes" being told to me by Rocque, Cipriano, Nelson, and others, and that this was creating a hostile work environment for me.

64. On March 24, 2015, my Union Shop Steward and myself met with Lieutenant Campbell at which time I gave Campbell a five page written letter I had written describing my complaints.  After this meeting, Campbell sent me directly over to see Terry York, the Human Resource Manager, so that I could give York a copy of her letter.

65. I personally gave Terry York a copy of my five page written, formal complaint on March 24, 2015 and watched as York read the document.

66. I moved to Maine from Long Island, New York.

67. My difficulties at the jail started when I finished my field training.

68. At the time I submitted my May 13, 2015 letter, I was afraid for my life because inmates were yelling at me, cursing at me, and calling me a "rat."

69. As a Jewish lesbian from New York, I knew that my colleagues would make fun of my accent, and cultural differences, but I also expected that over time, once they got to know me, they would see my high work ethic to excel at my job.  I thought they would accept me as part of the team.

70. No matter how hard I tried, that never happened.  There were barriers imposed upon me by my colleagues, superiors, and the County that I could not break through.

71. During a telephone conversation with Campbell on May 15, 2015, I told her that if the environment at the jail changed so that it was not hostile for me, I would be happy to return to work.

72. During the time that I worked at Kennebec County Correctional Facility, I became FaceBook friends with Rocque.

73. I took screen shots of public FaceBook posts on Terry York, Dan Cyr, and Jon Rocque's FaceBook pages.  A true copy of which are attached hereto as *Plaintiff's Exhibits 35, 36, 37*.


Dated:  September 4, 2018 　　　　　　　　　　　*/s/ Diedre M. DiGiacomo*
　　　　　　　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　　　　　　　Diedre M. DiGiacomo


STATE OF MAINE
Kennebec, SS.

　　　　Personally appeared the above-named, Diedre M. DiGiacomo, and declares under oath that the information contained herein is based upon her personal knowledge, information and belief, and when based upon information and belief, she believes the same to be true.


　　　　　　　　　　　　　　　　　　　　　　　　　　*/s/ Tanya Goding*
Dated: 　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　　　　　 Tanya Goding, Notary Public
　　　　　　　　　　　　　　　　　　　　　　　　　 My Commission Expires December 29, 2024

9