**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| DIEDRE DIGIACOMO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket no. 1:18-cv-163-GZS |
| | ) | |
| KENNEBEC COUNTY, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON DEFENDANTS' MOTION

This case is one of three related cases brought by former female corrections officers against Kennebec County and multiple employees of Kennebec County alleging various discriminatory and illegal practices at the Kennebec County Correctional Facility. While originally brought as one case, *Huard v. Kennebec County et al.*, D. Me. Docket No. 1:16-cv-00473-GZS, the Court ordered the claims of the three plaintiffs severed after the close of discovery.

Now before the Court is Defendants' Motion for Judgment on the Pleadings and for Summary Judgment (ECF No. 13). For reasons explained herein, the Court GRANTS IN PART AND DENIES IN PART the Motion.

## I. MOTION FOR JUDGMENT ON THE PLEADINGS

Before the Court turns its attention to Defendants' arguments for summary judgment, the Court considers two discrete issues for which Defendants seek judgment on the pleadings in accordance with Federal Rule of Civil Procedure 12(c). In considering these arguments, the Court has reviewed Plaintiff's Amended Complaint (ECF No. 1) and accepted all of her "well-pleaded factual averments" and drawn "all reasonable inferences in her favor." Feliciano v. Rhode Island,

160 F.3d 780, 788 (1st Cir. 1998). The Court recognizes at the outset that judgment on the pleadings may be entered where the complaint fails to "contain sufficient factual matter to state a claim to relief that is plausible on its face." Grajales v. Puerto Rico Auth., 682 F.3d 40, 44 (1st Cir. 2012) (internal citations omitted). Indeed, "[t]o cross the plausibility threshold a claim does not need to be probable, but it must give rise to more than a mere possibility of liability." Id. at 44–45.

First, the individual Defendants[1] seek judgment on the Plaintiff's employment discrimination claims (Counts IV, V, VIII, IX & X)[2] arguing that there is no individual liability under the respective federal and state statutes. On this point, the Court agrees with Defendants. The First Circuit has clearly held that "there is no individual employee liability under Title VII." Fantini v. Salem State Coll., 557 F.3d 22, 30 (1st Cir. 2009).

With respect to Maine's companion state statute, the Maine Human Rights Act ("MHRA"), 5 M.R.S.A. § 4551 *et seq.*, this Court has previously held, "there is no individual liability under the MHRA." Charette v. St. John Valley Soil & Water Conservation Dist., No. 1:17-CV-35-GZS, 2017 WL 2683951, at *12 (D. Me. June 20, 2017) (discussing Fuhrmann v. Staples Office Superstore East, Inc., 58 A.3d 1083 (Me. 2012)). While Plaintiff has cited a 2013 guidance memorandum from the Maine Human Rights Commission[3] as offering support for individual liability after Fuhrmann, the Court does not believe this memo can override the clear case law that

---

[1] The individual Defendants in this case are: Ryan Reardon, Marsha Alexander, Calista Campbell, Laura Briggs, Jessica Quinn, Terry York, Randall Liberty, Nancy Rines, Dan Cyr, Bob Devlin, George M. Jabar II, and Patsy Crockett.

[2] At Plaintiff's request, the Court has already dismissed the Maine Whistleblower Act claim (Count VI) as to the individual Defendants. See Plaintiff's Consented-to Motion to Dismiss Certain Claims (ECF No. 6) & 6/13/2018 Endorsement Order (ECF No. 7).

[3] See Memorandum from John P. Gause to Maine Human Rights Commission Staff (April 11, 2013), https://www.maine.gov/mhrc/guidance/memo/20130411_g.pdf (cited in Pl. Response (ECF No. 17), PageID # 321.)

supports judgment as a matter of law in favor of the individual Defendants named in this case. See, e.g., United States ex rel. Worthy v. E. Maine Healthcare Sys., No. 14-cv-00184-JAW, 2017 WL 211609, at *32 (D. Me. Jan. 18, 2017) (concluding that "only an employer can be liable" for employment discrimination and whistle-blowing retaliation); Fisk v. Mid Coast Presbyterian Church, No. 16-cv-00490-JDL, 2017 WL 1755950, at *4-*5 (D. Me. May 4, 2017).[4]  Thus, the Court concludes that each individual Defendant is entitled to judgment on the pleadings as to Plaintiff's statutory employment discrimination claims (Counts IV, V, VIII, IX & X).

Next, Defendants seek judgment on the pleadings as to Count XVI, which Plaintiff's First Amended Complaint describes as "criminal liability of Kennebec County, Kennebec County Sheriff's Office and its Corrections Division, Kennebec County Correction Facility, Kennebec County Commissioners and Kennebec County Administrator" and cites 17-A M.R.S.A. § 60. (First Am. Compl.  (ECF No. 1), PageID # 85).  As framed, this Count fails to state a claim upon which Plaintiff could recover any relief in the context of this civil case.  See, e.g., Larrabee v. Penobscot Frozen Foods, Inc., 486 A.2d 97, 101 (Me. 1984).  To the extent that Plaintiff has argued that Count XVI should be read to state a plausible civil RICO claim, the Court notes that Plaintiff's civil RICO claims are captured in Counts XIII-XV.

Therefore, the Court grants Defendants' request for judgment on the pleadings as to all Defendants on Count XVI and as to the individually named Defendants on Counts IV, V, VIII, IX

---

[4]  After the parties completed briefing on the present motion, the First Circuit issued its decision in Roy v. Correct Care Solutions, LLC, 914 F.3d 52 (1st Cir. 2019).  In Roy, the First Circuit held that Fuhrmann does not foreclose individual third-party liability under 5 M.R.S.A. § 4633.  See id. at 65-67.  However, in so holding, the Roy court noted that it took "no position on whether § 4633 would allow [a claim against an individual supervisor employed by the plaintiff's employer]."  Id. at 65 & n.7.  Given this caveat and prior precedent, the Court reads Roy as opening the door to § 4633 claims "against third parties not alleged to be agents of the employer."  Id.  None of the individual Defendants named here fall into that category.  As a result, the Court concludes that Roy's holding does not allow Plaintiff to state a plausible claim against the individual Defendants in this case.

& X. The Court next considers Defendants' request for summary judgment on Plaintiff's remaining claims.

## II.  MOTION FOR SUMMARY JUDGMENT

### A.  Legal Standard

Generally, a party is entitled to summary judgment if, on the record before the Court, it appears "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. A "material fact" is one that has "the potential to affect the outcome of the suit under the applicable law." Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 703 (1st Cir. 1993).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the Court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. See Santoni v. Potter, 369 F.3d 594, 598 (1st Cir. 2004).

Once the moving party has made this preliminary showing, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." Triangle Trading Co., Inc. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (quotation marks and internal ellipsis omitted); see also Fed. R. Civ. P. 56(e). "Mere allegations, or conjecture unsupported in the record, are insufficient." Barros-Villahermosa v. United States, 642 F.3d 56,

58 (1st Cir. 2011) (quoting <u>Rivera-Marcano v. Normeat Royal Dane Quality A/S</u>, 998 F.2d 34, 37 (1st Cir. 1993)); <u>see also</u> <u>Wilson v. Moulison N. Corp.</u>, 639 F.3d 1, 6 (1st Cir. 2011) ("A properly supported summary judgment motion cannot be defeated by conclusory allegations, improbable inferences, periphrastic circumlocutions, or rank speculation."). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment for the moving party." <u>In re Ralar Distribs., Inc.</u>, 4 F.3d 62, 67 (1st Cir. 1993). "However, summary judgment is improper when the record is sufficiently open-ended to permit a rational factfinder to resolve a material factual dispute in favor of either side." <u>Morales-Melecio v. United States (Dep't of Health and Human Servs.)</u>, 890 F.3d 361, 368 (1st Cir. 2018) (quotation marks omitted).

### B.    Factual Background

Defendant Kennebec County[5] is ultimately overseen by three elected county commissioners, Patsy Crockett, Nancy Rines, and George Jabar, each of whom is named as a Defendant in this case in both their individual and official capacities. The County Commissioners promulgate and amend the Kennebec County Administrative Regulations, which serve as the internal policies for the county. The day-to-day administration of Kennebec County is handled by County Administrator Bob Devlin and Human Resources Manager Terry York, both of whom are likewise named as individual Defendants in this case.

Defendant Kennebec County Sheriff's Office operates as a department within the county

---

[5] Plaintiff has separately named as Defendants various entities that fall under the umbrella of Kennebec County, including Kennebec County Sheriff's Office, the Corrections Division, Kennebec County Correctional Facility (together with Kennebec County, the "Kennebec County Defendants"). The Court considers any claims against these entities as claims against Kennebec County. <u>See</u> <u>Allen v. York Cty. Jail</u>, No. CIV. 01-224-P-C, 2003 WL 221842, at *7 (D. Me. Jan. 30, 2003), report and recommendation adopted, No. CIV. 01-224-P-C, 2003 WL 848287 (D. Me. Mar. 5, 2003) ("[S]uits against municipal subdivisions . . . are in essence suits against the municipality.)

government run by an elected Sheriff. During the time period relevant to this case, Defendant Randall Liberty was the Kennebec County Sheriff. Defendant Ryan Reardon worked as the assistant corrections administrator beginning in September 2011 and remained in that position until July 1, 2013, when he became chief deputy. Reardon became interim sheriff on September 28, 2015.

Within the Sheriff's Office, there is a Corrections Division that operates the county jail, also known as the Kennebec County Correctional Facility ("KCCF"). Various KCCF employees make up the remainder of the individually named Defendants in this case, including:

- Marsha Alexander, who began working for Kennebec County in 1998 and worked as the jail administrator from August 2011 until March 2017.

- Laura Briggs, who began working for Kennebec County in September 2003 and was promoted to a corporal in February of 2012, then to a sergeant in November 2013, then a staff sergeant in August 2015, and a lieutenant in October 2016. Briggs left her employment with Kennebec County on January 6, 2017.

- Calista Campbell, who began working for Kennebec County as a clerical specialist in November 2010. Campbell was promoted to staff sergeant in February 2013 and then again promoted to assistant corrections administrator in January 2014.

- Jessica Quinn, who was hired as a clerical specialist at KCCF in July 2011. Quinn then became a part-time corrections officer in November 2012. In March 2016, she became the KCCF programs director.

- Dan Cyr, who was employed as a sergeant at KCCF from July 2011 through August 2016.

In addition to the KCCF employees named as Defendants, DiGiacomo's factual

allegations refer to multiple fellow corrections officers, including Officers Rocque, Nelson, Underwood, Wilhoite, Simmons, and Cipriano. These KCCF employees were DiGiacomo's co-workers and did not supervise DiGiacomo's work. All told, between 2010 and 2016, the Kennebec County Correctional Facility employed 209 people; 57 of these employees were female and 152 of these employees were male. During the time period relevant to this case, all KCCF employees were required to follow the rules laid out in the KCCF Policy & Procedures Manual, which was subject to annual review and revision.

According to at least one other employee, as the jail administrator, "Marsha Alexander was running the show" inside KCCF during this time period with "limited supervision." (Morin Dep. (ECF No. 18-7), PageID # 417.) Alexander, in turn, maintained personal friendships with Briggs, Campbell, and Quinn, all of whom were heterosexual. Because of these friendships, other employees viewed all four women (Alexander, Briggs, Campbell & Quinn) as having "certain perks" as well as the ability to influence how the facility was run. (Heavey-Morin Dep. (ECF No. 18-6), PageID # 412.) However, many other KCCF employees were "worried about their jobs" and "the number and the constant investigations that were going on." (Morin Dep., PageID # 416.)

Against this backdrop, Plaintiff Diedre DiGiacomo ("DiGiacomo") [6] began working as a corrections officer for Kennebec County on November 4, 2013. As part of her orientation, she received sexual harassment training.[7] As a Jewish lesbian woman who had relocated from New York, DiGiacomo expected "that there would be some degree of light-hearted poking fun of her accent, and her cultural differences." (DiGiacomo Aff. (ECF No 18-1), PageID # 377.) But, she

[6] Prior to getting married on April 8, 2015, she went by her maiden name, Diedre Imperial.

[7] She also did an annual recertification of her sexual harassment training on the computer.

also hoped and expected "that over time, once they got to know [her,] . . . they would accept [her] as part of the team." (Id., PageID # 377.) DiGiacomo fulfilled the statutory probationary period for corrections officers on November 4, 2014. After this date, she was a member of the union at KCCF.

### Digiacomo's Counseling and Disciplinary Action History

During her tenure, Kennebec County documented three instances in which DiGiacomo received some form of counseling or discipline. Each incident is captured on a Kennebec County Sheriff's Office Counseling and Disciplinary Action Form. First, on May 2, 2014, Sergeant Keith LaChance documented his verbally counseling of DiGiacomo for having taken four sick days between January 2014 and April 2014, which were considered "unauthorized absences and abuse of sick time." (Def. Ex. 2 (ECF No. 14-8), PageID # 269.) DiGiacomo's written response indicated that the absences were due to her mother's health problems.

Second, on July 14, 2014, Sergeant Peabody gave DiGiacomo a written reprimand for refusing an "order in" on June 12, 2014.[8] On June 12, DiGiacomo was working a shift when a rash she already had became severe.[9] KCCF medical staff provided DiGiacomo medication, including Benadryl, which made DiGiacomo feel sick and very drowsy. She contacted Corporal Gardiner to report her medical issues and ask if she could be relieved from her floor duties. No relief was sent to the floor. Instead, towards the end of the shift, DiGiacomo was told by Sergeant Peabody she was being "ordered in," which meant she was being required to stay and work additional hours. In addition to her medical issues, DiGiacomo also was unable to stay at work

---

[8] The Court notes that while the applicable disciplinary action form (ECF No. 14-9) put the date of DiGiacomo's "order in" incident as 6/22/14, the summary judgment record indicated that the incident actually occurred on 6/12/14 and that the reference to 6/22/14 is simply a typographical error.

[9] The rash was later diagnosed as scabies, which DiGiacomo had contracted at the jail.

that day because she could not secure last-minute child care for her special needs children.[10]  As a result of her refusal of the additional "order in" hours, she received a write-up.  However, DiGiacomo appealed the write-up.  On July 23, 2014, DiGiacomo met with Lieutenant Campbell, along with Union Steward Huard, to discuss her appeal.  Ultimately, Campbell downgraded DiGiacomo's written reprimand over the "order in" to a verbal counseling and noted that DiGiacomo would be obtaining a medical note to support her request for no short notice order-ins in the future.[11]

Third, on September 10, 2014, DiGiacomo received verbal counseling for violating a KCCF Policy that required all employees to treat inmates with respect.  The incident at issue took place on May 31, 2014 when DiGiacomo "lost [her] temper" with an inmate who sought service of a meal from her meal cart in his underwear.  (Def. Ex. 4 (ECF No. 14-10), PageID # 273.)

DiGiacomo acknowledges that none of these reprimands resulted in her losing pay or responsibilities.  In fact, DiGiacomo never experienced any unrequested change in job assignment or work responsibilities while employed at KCCF.[12]

---

[10] Citing F.R.E. 801(d)(1), Defendants have moved to strike Plaintiff Exhibit 15 (ECF No 18-22), which appears to be DiGiacomo's handwritten statement in support of her appeal.  See Def. Reply SMF (ECF No. 25), PageID #s 630-31.  While reserving ruling on whether this particular exhibit might be admissible at trial under any circumstances, the Court notes that the undisputed material facts regarding this particular incident are laid out in sufficient detail in other portions of the record.  See, e.g., Def. Ex. 3 (ECF No. 14-9); DiGiacomo Aff. (ECF No. 18-1), PageID # 374, Pl. Ex. 16 (ECF No. 18-23).  As a result, the Court deems Defendants' request to strike Plaintiff Exhibit 15 MOOT for purposes of the present motion.

[11] As of July 30, 2014, Lieutenant Campbell had notified all KCCF supervisors that for "a legitimate reason" DiGiacomo must be provided at least 24 hours notice before being ordered in.  Pl. Ex. 3 (ECF No. 18-10), PageID # 420.

[12] DiGiacomo did complain that she was denied an opportunity to train on intake, which she attributed to Sergeant Cyr not "lik[ing] to train females at Intake."  Pl. Ex. 26 (ECF No. 18-33), Page ID # 533.  The record establishes that between 2010 and 2016, seventy-three KCCF employees received training to work in intake; twenty-four of these employees were female and forty-nine were male.  (St. Pierre Aff. (ECF No. 14-2), PageID # 257.)

**DiGiacomo's Work Environment at KCCF**

DiGiacomo's complaints focus on the work environment she experienced during her eighteen months of employment at KCCF. After she completed her initial field training, DiGiacomo began working as a corrections officer on the midnight to 8 a.m. shift. During these shifts she worked with Officer Rocque, who made jokes and comments that DiGiacomo found "extremely offensive." (DiGiacomo Aff., PageID # 371.) On one occasion, DiGiacomo was paired with Officer Rocque to complete the rehanging of shower curtains. In response to DiGiacomo suggesting to Rocque that he was making the task harder than it might be if they hung the curtains differently, Rocque responded that "the only thing that should be making me hard in this shower is you." (7/17/17 DiGiacomo Dep. (ECF No. 18-2), PageID #s 393-394.)

DiGiacomo initially responded to Rocque's offensive remarks using the "officer respect" strategy she learned during training, which encouraged her to approach fellow officers directly and request that they stop the offending behavior. However, by the end of January 2014, DiGiacomo was approached by Sergeant LaChance, the immediate supervisor on the night shift, who inquired about issues between Rocque and DiGiacomo that he had heard about from other officers. At that time, DiGiacomo verbally reported Rocque's inappropriate comments, including the shower comment, to LaChance and expressed her desire to handle the situation using officer respect. Nonetheless, LaChance told DiGiacomo he would make note of the issue and speak to Rocque about it.

DiGiacomo also encountered comments from fellow officers that she considered anti-Semitic. DiGiacomo took particular offense to an officer who sarcastically compared the conditions inside the jail to Auschwitz. Additionally, multiple officers would mock DiGiacomo

by repeating words she used with a "Jewish phonetic pronouncement." (DiGiacomo Aff., PageID # 376.)

Soon after her initial discussion with LaChance, DiGiacomo began keeping notes of comments and behaviors by her fellow corrections officers that she considered offensive. By March 2014, Sergeant LaChance called DiGiacomo to the office to specifically ask about her notetaking. LaChance indicated that DiGiacomo "would get in trouble for keeping notes." (3/1/18 DiGiacomo Dep. (ECF No. 18-3), PageID # 402.)

In April 2014, DiGiacomo moved to the 8 a.m. to 4 p.m. shift. She believed this shift change would improve her work environment and alleviate the offensive comments, which she had mainly attributed to working with Rocque. However, on May 4, 2014, Rocque moved to this daytime shift and resumed making inappropriate and offensive comments to DiGiacomo.

On June 26, 2014, Officer Underwood told DiGiacomo "if you had a sexy piece of chocolate like me, you wouldn't be a lesbian." (7/17/17 DiGiacomo Dep. (ECF No. 14-15), PageID #s 303-304.) DiGiacomo reported this comment to Campbell during the July 23, 2014 meeting regarding the appeal of her second disciplinary write-up.

On July 19, 2014, DiGiacomo met with LaChance and gave him a detailed statement regarding a different incident with Officer Underwood that occurred that same day. As relayed in DiGiacomo's statement, Underwood called her a "whiny bitch" after she complained about floor conditions upon her arrival on shift. When Underwood indicated an unwillingness to assist with the clean-up work, DiGiacomo told him he was being "fucking lazy." (Pl. Ex. 11 (ECF No. 18-18), PageID #s 462-63.)[13]

---

[13] The Court recognizes that the summary judgment record also includes dueling statements from Officer Underwood and Officer Wilhoite, both dated July 20, 2014. See Pl. Exs. 12 & 13 (ECF Nos. 18-19 & 18-20). However, the Court recounts the material facts regarding this incident in the light most favorable to Plaintiff.

LaChance's July 25, 2014 statement to Staff Sergeant Black acknowledged meeting with DiGiacomo on July 19 and indicated a discussion of multiple topics, including DiGiacomo "making inappropriate comments to Officer Underwood" and proper procedure for feeding and speaking with inmates. (Pl. Ex. 14 (ECF No. 18-21), PageID # 467.) LaChance's written statement regarding the interactions between DiGiacomo and Underwood does not include any mention of DiGiacomo being subject to inappropriate comments by Underwood.[14] However, LaChance did take the opportunity to reference another incident involving DiGiacomo, which was later resolved via LaChance's written confirmation of verbal counseling, which DiGiacomo received on September 10, 2014. (Def. Ex. 4 (ECF No. 14-10), PageID #s 273-74.)

On July 30, 2014, Campbell convened a "clearing the air meeting" with Underwood, DiGiacomo, and Union Shop Steward Huard to discuss "tensions reported the day prior" by DiGiacomo. (Pl. Ex. 17 (ECF No. 18-24). Campbell later summarized the meeting in relevant part, as follows: "Both Underwood and [DiGiacomo] made unprofessional comments towards each other while on shift . . . . Both acknowledged that what they said was wrong and owned it."[15] Id. Campbell never documented any sexually harassing statements by Underwood or disciplined Underwood for any statements made to DiGiacomo.

On March 17, 2015, Officer Simmons attempted to play a prank on DiGiacomo and Huard by jumping out from behind a wall while both officers were descending the stairs. DiGiacomo

---

[14] To the extent Plaintiff has asked the Court to take note of inconsistencies in the July dates listed in LaChance's July 25 statement (ECF No. 18-21) and the related Counseling & Disciplinary Action Form (ECF No. 14-10), the Court does not consider these inconsistencies material to the issues raised by the pending Motion. See Pl. Response SMF, PageID # 359. On the Action Form, the Court surmises that the time period between the initial report date (7/16/2014) and DiGiacomo's signature date reflects the fact that the incident was set to have a follow-up on "09/10/14." Def. Ex. 4 (ECF No. 14-10), PageID # 274; see also Pl. Response SMF, PageID # 359.

[15] It appears that during the meeting, Campbell did directly ask Underwood to clarify DiGiacomo's unprofessional comment. However, no similar questions were posed regarding the name calling Underwood had engaged in. See DiGiacomo Aff. (ECF No. 18-1), PageID # 375; Pl. Ex. 18 (ECF No. 18-25), PageID #474.

was startled by Simmons and fell down on the stairs injuring her back. Simmons received a "Written Confirmation of Verbal Counseling" for this incident. While this is the only occasion in which DiGiacomo sustained a physical injury, she was subjected to "jump-scares" on a weekly basis by multiple officers once the officers learned she had "a significant startle reflex." (DiGiacomo Aff., PageID #s 376-77.) DiGiacomo came to worry that inmates were going to learn of her startle reflex as a result of these pranks and that it would put her at risk when working directly with inmates.

In addition to the well-documented incidents just described, DiGiacomo recalls other pranks and banter that were a frequent part her work environment at KCCF. On one occasion in March 2015, Corporal Gardner pulled a diaper prank, which DiGiacomo found offensive. (DiGiacomo Aff., PageID # 376.) On another occasion, Officer Cipriano presented DiGiacomo a rag filled with toothpaste and suggested that it was actually semen and the result of an inmate having masturbated into the rag. (Id.) At some point in March of 2015, Cipriano licked another officer's arm. DiGiacomo learned of this incident when Cipriano told her, "I just licked a lesbian." (Id.)

On multiple occasions, DiGiacomo felt that the comments and questions from her fellow corrections officers were "sexually inappropriate" and referred to stereotypes based on her sexual orientation. (7/17/17 DiGiacomo Dep. (ECF No. 14-5), PageID # 305.) These comments included a reference to another correction officer's crotch and the use of the phrase "bean licker." (Id. & (DiGiacomo Aff., PageID #s 371 & 376.)

Additionally, DiGiacomo felt multiple corrections officers made unprofessional and offensive comments about inmates that did not accord with KCCF policies. These incidents included:

On June 26, 2014, DiGiacomo overheard Officer Routhier refer to an inmate as a "dick

head" while speaking with Officer Martinez.  (DiGiacomo Aff., PageID # 374.)

At the end of June 2014, while DiGiacomo was attempting to assist Officer Willhoite in locating a particular inmate, Willhoite remarked, "who cares all black people look alike." (DiGiacomo Aff., PageID # 375.)  During a discussion of a recent attempted hanging by an inmate, another corrections officer said the incident was "just a show," and Willhoite stated "wouldn't have mattered if he died, he's an inmate."  (Id.)  On another occasion, Willhoite bragged about slamming an inmate into a wall.  The very next day, Willhoite stated that a particular inmate "needs to be shot and put into a foreign jail."  (Id.)  DiGiacomo's efforts to use "officer respect" with Willhoite did not work.

On September 28, 2014, DiGiacomo observed Willhoite taunt and agitate an inmate by calling him the name "Texiera." (Id.)

On March 29, 2015, Officer Willey stated to DiGiacomo, "send the homos up," in referencing the inmates who worked in the kitchen. (Id. at PageID # 376.)

**DiGiacomo's Reports[16]**

DiGiacomo made numerous reports to Cyr, her immediate supervisor on the 8-4 shift, that she was being sexually harassed, that she was offended by the "jokes" being told to her by Rocque, Cipriano, Nelson, and others, and that this was creating a hostile work environment for her.  DiGiacomo met with Cyr, both with Union representation and without Union representation. In DiGiacomo's estimate, these conversations with Cyr occurred weekly at first and later became "almost daily."  (7/17/17 DiGiacomo Dep. (ECF No. 14-5), PageID # 303.)  In a memorandum dated April 7, 2015, Sergeant Cyr acknowledged that DiGiacomo had come to him "on several

---

[16] In addition to the reports described in this section, there is a genuine dispute of fact as to when and if DiGiacomo ever reported any harassment directly to Briggs.  See Defs. Reply SMF (ECF No. 25), PageID # 636.  The record does include one email from Briggs to Campbell documenting a DiGiacomo complaint about Cyr and intake training opportunities for women.  See Pl. Ex. 26 (ECF No. 18-33), PageID # 533.

occasions." (Pl. Ex. 27 (ECF No. 18-34), PageID # 534.) Cyr specifically noted that DiGiacomo had complained about Officer Wilhoite "making comments about hurting animals" and recalled that he and Corporal Gardner had a follow-up meeting with Wilhoite about "what is and is not appropriate to talk about while at work." (Id.) In an email dated May 11, 2015, Sergeant Cyr documented a meeting with DiGiacomo that day in which she had claimed she was experiencing "retaliation" and would be seeking another meeting with Campbell. (Pl. Ex. 33 (ECF No. 18-40), PageID # 543.)

DiGiacomo had a prior meeting with Campbell on March 24, 2015. Deborah Huard attended as the Union Shop Steward. During this meeting, DiGiacomo gave Campbell a five-page written letter describing her complaints, which included allegations of discrimination, sexual harassment, and a hostile work environment. (See Joint Ex. A (ECF No. 12-1).) These steps followed the protocol for reporting sexual harassment, hostile work environment, and retaliation pursuant to her training from Kennebec County. After the meeting, Campbell sent DiGiacomo to see Terry York. In addition to speaking with DiGiacomo, York received a copy of DiGiacomo's five-page letter.

Despite her reported complaints during her term of employment, DiGiacomo was never interviewed by any Kennebec County employee, nor was she ever advised that any investigation was being conducted by Kennebec County. DiGiacomo expected that supervisors and administrative personnel would protect her, follow policy and procedure to do an investigation, and to take action to end the harassing behavior, discrimination, and hostile work environment she had reported.[17]

---

[17] Plaintiff attempts to further support and explain the inaction and offensive behavior of some Kennebec County employees with "screen shots of public Facebook posts" made by Terry York, Dan Cyr and Jon Rocque, which appear to reflect their respective religious and political views. Defendants have moved to strike these exhibits (Plaintiff's Exhibits 35, 36 & 37). Defendants argue that this evidence is irrelevant, unauthenticated hearsay. On the current

Instead, Lieutenant Campbell's follow-up on DiGiacomo's March 2015 complaints consisted of a series of one-on-one meetings with specific corrections officers. First, Campbell met with Officer Rocque and informed him that comments on another officer's religion or sexuality would not be tolerated. Campbell also had a separate meeting with Officer Nelson with a similar admonition. She then met with Officer Simmons and documented verbal counseling to Simmons surrounding the "horseplay" in which DiGiacomo was injured. Finally, Campbell arranged additional sexual harassment training by Terry York during shift briefings on March 31, 2015, April 1, 2015, and April 2, 2015. (See Pl. Ex. 10 (ECF No. 18-17), PageID #s 458-59.)

After this March 23rd meeting, DiGiacomo submitted a written request to change from full-time to part-time hours, which was approved by Alexander on April 1, 2015, and took effect on April 6, 2015. (See Joint Ex. B (ECF No. 12-2), PageID # 225.)

After DiGiacomo made her reports in Spring 2015, she felt her fellow officers targeted her for further harassment. On April 25, 2015, Corporal McLean announced over the loud speaker "Simmons don't try to hurt any officers today," DiGiacomo found this to be a "joking yet offensive" reference to the March 17th incident where DiGiacomo fell down the stairs and sustained an injury as a result of a prank by Simmons. (DiGiacomo Aff., PageID # 376.) On May 11, 2015, DiGiacomo was informed by Sergeant Cyr that other officers were making complaints about allegedly offensive comments made by DiGiacomo. (See Pl. Ex. 34 (ECF No. 18-41), PageID # 544-45.) More alarming for DiGiacomo, corrections officers had told inmates that DiGiacomo "was ratting them out" and, as a result, inmates were starting to call her "a rat" and telling her, "you know what we do with rats." (3/1/18 DiGiacomo Dep. (ECF No. 18-3), PageID # 401.)

---

record, the Court agrees and, on that basis, GRANTS Defendants' request to strike Plaintiff's Exhibits 35, 36 & 37. See Defs. Reply SMF (ECF No. 25), PageID # 641.

**DiGiacomo's Resignation**

DiGiacomo resigned her position with Kennebec County as of May 13, 2015.

On May 15, 2015, DiGiacomo and Campbell had a telephonic conversation. DiGiacomo advised Campbell, "due to the hostile work environment and also the retaliation from officers informing inmates that I was a rat and being told by inmates we know what we'd do to a rat, get her out of the block, it was an unsafe, hostile work environment, not just with officers but it was becoming with inmates after I came forward." (7/17/17 DiGiacomo Dep. (ECF No. 18-2), PageID # 382.) During this call, Campbell asked if DiGiacomo would be willing to come back to work and DiGiacomo said she would "be willing to come back at any time if the work environment changes." (Id., PageID # 383.) However, absent such a change, DiGiacomo said she "couldn't go there anymore everyday." (Id.)

DiGiacomo did not grieve any issues to the County Commissioners before or after her resignation. The Collective Bargaining Agreement between Kennebec County and the National Correctional Employees Union (hereinafter, "CBA") provides a grievance procedure which allows aggrieved employees to pursue a grievance first with the correctional facility administrator, which may then be brought to the County Commissioners. If the Union finds the Commissioners' decision unacceptable, it may also seek to arbitrate the grievance before the Maine Board of Arbitration and Conciliation. (See CBA (ECF No. 14-14), PageID # 284.)

DiGiacomo filed a complaint with the Maine Human Rights Commission on October 5, 2015. She received a right-to-sue letter from MHRC dated October 5, 2016, a copy of which was also sent to Defendants through counsel. DiGiacomo also received a right-to-sue letter from the Equal Employment Opportunity Commission, a copy of which was also sent to Defendants through counsel.

In January 2016, Officer Pierce, another female KCCF corrections officer, made a complaint of sexual harassment by some of her fellow corrections officers. In response to this officer's written complaint, the Office of Professional Review ("OPR") immediately commenced an Internal Affairs investigation with York actively participating in all of the interviews conducted. The investigation was completed in approximately a month and resulted in a written reprimand being issued to one male corrections officer for violation of the County's policy on sexual harassment.[18]

## C. Discussion

Defendants seek summary judgment on all of Plaintiff's remaining claims. These claims essentially fall into four categories: (1) RICO (Counts XIII, XIV & XV), (2) breach of contract (Count XI), and (3) statutory discrimination (Counts IV, VIII, IX & X), and (4) statutory retaliation (Counts V & VI). The Court considers each of these four categories of claims in turn.

### 1. RICO Claims

While the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-68, is widely known as a tool for criminal prosecution of organized crime, the statute also has "a generous private right of action" for plaintiffs who can prove "they were 'injured in [their] business or property by reason of a violation of section 1962.'" Home Orthopedics Corp. v. Rodriguez, 781 F.3d 521, 527 (1st Cir. 2015) (quoting 18 U.S.C. § 1964(c)). As relevant here, "[t]o state a civil RICO claim, . . . a plaintiff must allege: (1) conduct, (2) of an enterprise, (3) through . . . a pattern ... of racketeering activity." Id. at 528 (internal citations and quotations

---

[18] The documents related to this OPR investigation have been filed under seal . See Pl. Ex. 4 (ECF No. 18-11). While Defendants have made a request to strike this exhibit as irrelevant, the Court concludes for purposes of the pending motion, these facts are relevant in light of the temporal proximity of this written complaint (January 2016) and DiGiacomo's written complaints (March 2015). However, the Court notes that the reprimanded corrections officer in this 2016 case was not one of the corrections officers named in any of DiGiacomo's complaints. Thus, the relevance is limited to the differing procedures used to handle the written complaints, which a factfinder might conclude provides circumstantial evidence that a factfinder could use in assessing Defendants' response to DiGiacomo's complaints.

omitted).  A "pattern" of racketeering "requires a plaintiff to show that at least two acts of racketeering occurred within ten years of each other."  Id. (citing 18 U.S.C. § 1961(5)).  While many types of illegal activities fall under RICO's definition of racketeering, found in 18 U.S.C. § 1961(1), Plaintiff's briefing in this case asserts Defendants' racketeering consisted of "violation of the Hobbs Act, theft by extortion and bribery in official and political matters in violation of state criminal statutes."[19]  (Pl. Response (ECF No. 17), PageID # 344.)

As the First Circuit has previously explained, "While it may be theoretically possible to allege a wrongful discharge which results directly from the commission of a RICO predicate act . . . any such safe harbor would be severely circumscribed."  Camelio v. Am. Fed'n, 137 F.3d 666, 672 (1st Cir. 1998) (quoting Miranda v. Ponce Federal Bank, 948 F.2d 41, 41 (1st Cir. 1991)).  As noted in Camelio, RICO claims arising from employment disputes have frequently failed to survive even a motion to dismiss.  See id. (noting this was the "fourth time in recent years" such a dismissal was affirmed).  In this case, the Court must consider whether Plaintiff has any trialworthy RICO claim based on her allegations that "lesbian personnel at Kennebec County were under constant threat of losing their jobs" and, in fact, lost their jobs as a result of "extortion" by Defendants.  (Pl. Response, PageID # 347.)

On the record presented, Plaintiff cannot pass over two critical hurdles to survive summary judgment on her RICO claims.  First, Plaintiff has not presented trialworthy evidence that her resignation and resulting job loss were proximately caused by any of the predicate acts she alleges. RICO "requires proof that at least one of the defendant's predicate acts was the proximate cause of

---

[19] To the extent that Plaintiff alleges "numerous" other violations of federal and state law that qualify as racketeering for purposes of RICO, Plaintiff has failed to present any argument or evidence that would support a trialworthy claim based on these alternatively alleged acts of racketeering.  Additionally, Defendants correctly assert that many of the actions alleged in the Amended Complaint do not qualify as enumerated crimes for purposes of 18 U.S.C. § 1961. (Pl. Response, PageID # 344 (citing the Am. Compl. ¶¶ 303, 324, 325, 328); Def. Motion, PageID #s 166-167.)

the plaintiff's injuries." Camelio, 137 F.3d at 670. Here, the trialworthy evidence that any extortion by a named Defendant proximately caused DiGiacomo's May 13, 2015 resignation is simply lacking.

Second, even viewing the record in the light most favorable to Plaintiff, there is simply no trialworthy evidence of extortion.[20] Under the Hobbs Act, an act of extortion requires that transferable property move from the victim into the possession of the extortionist. Sekhar v. United States, 570 U.S. 729, 734 (2013) (concluding that a favorable recommendation did not qualify as "obtainable property" under the Hobbs Act). Maine law appears to similarly require that extortion can only occur when a person "obtains or exercises control over the property of another." 17-A M.R.S.A. §§ 352(1) & 355. Plaintiff asserts a property right in "her right to employment free of discrimination." (Pl. Response, PageID # 346). She fails to present evidence that would allow a factfinder to conclude that any of the named Defendants actually obtained her job, such that they were able to control this property interest and pass it to another person. Thus, even assuming that a factfinder might conclude that one or more of the Defendants took actions that contributed to DiGiacomo losing her position with Kennebec County, the record does not support a finding that the job itself was obtainable property.

Therefore, the Court concludes that Defendants are entitled to summary judgment on all of Plaintiff's RICO Claims (Counts XIII, XIV & XV).

## 2. Breach of Contract Claims

In Count XI, Plaintiff asserts breach of contract based on three different alleged contracts: (1) the CBA (Count XI(A)), (2) the KCCF Policy & Procedure Manual and Kennebec County Administrative Regulations (Count XI(B)), and (3) the Kennebec County Administrative

---

[20] Moreover, Plaintiff has not put forward evidence of two separate acts of extortion as required by the statute. See 18 U.S.C. § 1961(5) (laying out requirement of two acts of racketeering within a ten year period).

Regulations, specifically Regulation No. 04-04-02 pertaining to restrictions on hiring relatives (Count XI(C)). Defendants seek summary judgment on all three theories.

As to Count XI(A), Defendants argue that Plaintiff's failure to follow the grievance procedure in the CBA bars her from bringing a claim for breach of that agreement. In support of their argument, Defendants cite Republic Steel Corp. v. Maddox, 379 U.S. 650 (1965). In Republic Steel, the Supreme Court held that "individual employees wishing to assert contract grievances must attempt use of the contract grievance procedure agreed upon by employer and union" and cannot "completely sidestep available grievance procedures in favor of a lawsuit." Id. at 652-53; see also Hughes v. Univ. of Maine, 652 A.2d 97, 99 (Me. 1995) (affirming dismissal of employee's complaint and citing Republic Steel). Plaintiff's rebuttal invokes her "nonwaivable" claims under "the MHRC and Title VII." (Pl. Response, PageID # 341.) However, nothing in her argument explains why her breach of contract claim is not subject to the exhaustion requirement cited by Defendants. In short, the Court finds Defendants are entitled to summary judgment on Plaintiff's claim for breach of the CBA based on her failure to exhaust the four-step grievance procedure clearly laid out in the CBA.

As to Count XI(B) & (C), Defendants argue that Plaintiff cannot pursue a breach of contract claim based on the KCCF Policy & Procedure Manual[21] or the Kennebec County Administrative Regulations[22] because such policies do not create an enforceable employment contract. Defendants cite Taliento v. Portland W. Neighborhood Planning Council, 705 A.2d 696, 700–06 (Me.1997) in support of this argument. In Taliento, the Law Court found the personnel policy

---

[21] At least an excerpt of the Manual is contained in the summary judgment record at ECF No. 18-12.

[22] Copies of the applicable regulations are contained in the summary judgment record at ECF Nos. 14-11 & 14-12.

at issue did not create an employment contract and affirmed summary judgment in favor of an employer.  See id. at 699 (citing Libby v. Calais Reg'l Hosp., 554 A.2d 1181, 1183 (Me. 1989)).

In responding to Defendants' argument, Plaintiff invokes the CBA and 30-A M.R.S.A. § 501(2-A), as requiring "just cause" for any discharge.  (Pl. Response (ECF No. 17), PageID # 342.) Thus, Plaintiff argues that the CBA and the just-cited statute "triggers . . . DiGiacomo's contract rights under the personnel policies and the administrative regulations."  (Id., PageID # 343.) Because DiGiacomo resigned and was not terminated, there is simply no wrongful termination claim under 30-A M.R.S.A. § 501.  However, even if the facts supported a violation of this Maine statute, the resulting claim is a statutory one, not a breach of contract claim.  See generally Gorham v. Androscoggin Cty., 21 A.3d 115, 117–18 (Me. 2011) (reviewing a claim under 30–A M.R.S.A. § 501 brought by a corrections officer who claimed he was wrongfully terminated). Second, to the extent any violation of the administrative regulations or KCCF policy and procedure manual trigger contractual rights under the CBA, any such claim would fall under the breach of contract theory pled as Count XI(A).  In short, the Court concludes that Defendants are clearly entitled to summary judgment on Counts XI(B) & (C).

### 3.  Statutory Claims

What remains for the Court's consideration are Plaintiff's statutory claims for employment retaliation and discrimination.  Before delving into a review of the summary judgment record as to these various claims, the Court addresses Defendants' comprehensive argument that they are entitled to summary judgment as to all of these statutory claims because Plaintiff, who acknowledges having tendered her resignation, lacks evidence from which any reasonable factfinder could conclude that she experienced an adverse employment action during her tenure at KCCF.

### a. The Requisite Adverse Action

In her opposition to Defendants' Motion, Plaintiff makes clear that "constructive discharge is the adverse employment action" at issue in this case.[23] (Pl. Response (ECF No. 17), PageID # 332.) As this Court has previously acknowledged, "'[c]onstructive discharge' is not a stand-alone cause of action but a way of satisfying the adverse action element of an employment discrimination claim." See Charette v. St. John Valley Soil & Water Conservation Dist., 332 F. Supp. 3d 316, 353–54 (D. Me. 2018) (citing Levesque v. Androscoggin Cty., 56 A.3d 1227, 1229 (Me. 2012)); see also Rivera-Rivera v. Medina & Medina, Inc., 898 F.3d 77, 96-97 (1st Cir. 2018) (reviewing a retaliation claim based on constructive discharge).

"The constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point such that his 'working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'" Green v. Brennan, 136 S. Ct. 1769, 1776 (2016) (quoting Pennsylvania State Police v. Suders, 542 U.S. 129, 141 (2004)). Whether the intolerable conditions are created through discriminatory action or a hostile work environment, the conditions must "become so onerous, abusive, or unpleasant that a reasonable person in the employee's position would have felt compelled to resign." Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 54 (1st Cir. 2000) ("The workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins— thick enough, at least, to survive the ordinary slings and arrows that workers routinely encounter in a hard, cold world.") This means that "[c]onstructive discharge usually refers to harassment so

---

[23] Given Plaintiff's clearly expressed intention to move forward with constructive discharge as the sole adverse action on all of her claims, the Court does not address Defendants' arguments regarding why other disciplinary actions do not amount to timely adverse actions for purposes of Plaintiff's claims. See Def. Mot. (ECF No. 13), PageID # 232.

severe and oppressive that staying on the job while seeking redress—the rule save in exceptional cases—is intolerable." Lee-Crespo v. Schering-Plough Del Caribe Inc., 354 F.3d 34, 45 (1st Cir. 2003) (quotation marks omitted). "The standard is an objective one; an employee's subjective perceptions do not govern." Lee-Crespo, 354 F.3d at 45.

The Court recognizes that the cases just cited set an undeniably high bar for constructive discharge claims. Nonetheless, viewing the evidence in the light most favorable to Plaintiff, the Court believes that Plaintiff has presented trialworthy evidence that she was constructively discharged in May of 2015. While DiGiacomo's subjective perceptions are well-documented throughout the record, Defendants attempt to objectively frame the work environment as consisting of merely "occasional inappropriate sexual comments and comments about her religion" by co-workers. (Defs. Mot. (ECF No. 13), PageID # 231.) The Court disagrees with Defendants' characterization. Rather, the record reflects that by May 2015, the work environment had reached a level that a reasonable jury could conclude was intolerable. Specifically, DiGiacomo has proffered evidence that would allow a factfinder to conclude that her fellow KCCF officers had essentially encouraged inmates to view DiGiacomo as a "rat," which in turn created a work environment in which a reasonable corrections officer would fear for his or her personal safety.

Given this conclusion, what remains for the Court's consideration is whether the summary judgment record contains sufficient evidence for a jury to connect Plaintiff's constructive discharge to any of her various retaliation or discrimination claims and thereby present a "prima facie case" to support her specific claim of discrimination or retaliation.

### b. Statutory Retaliation Claims

The Court first considers Plaintiff's retaliation claims. Plaintiff presents two separate theories of retaliation: (1) that she was retaliated against generally for opposing practices in

violation of Title VII and the MHRA (Count V), and (2) that she was retaliated against for "whistleblowing activity," within the meaning of the Maine Whistleblowers' Protection Act ("MWPA"), 26 M.R.S.A. § 833(1)(A), (Count VI).[24]  In order to establish a prima facie case of retaliation, a plaintiff must show that (1) she engaged in protected conduct under the applicable statute; (2) she was subjected to an adverse employment action; and (3) the adverse employment action is causally linked to the protected conduct.  See Rivera-Rivera, 898 F.3d at 94; see also Pippin v. Boulevard Motel Corp., 835 F.3d 180, 183 (1st Cir. 2016) (discussing the same elements for MWPA).  Defendants seek summary judgment based on a lack of adverse action and, alternatively, based on lack of causal connection.

Having already concluded that the record provides ample evidence from which a factfinder could conclude that DiGiacomo was constructively discharged, the only remaining question is whether the record includes evidence from which a jury could conclude that the constructive discharge is causally linked to DiGiacomo's protected reports.  Under both Title VII and the applicable Maine statutes, Plaintiff must show that she would not have been constructively discharged but-for her protected complaints.  See Roy v. Correct Care Solutions., LLC, 914 F.3d 52, 70 (1st Cir. 2019) ("The causation element of a Title VII retaliation claim is not satisfied by evidence that retaliation was one motivating factor in the adverse action.  Instead, [a plaintiff] must show "but-for" causation . . . .") (internal citations omitted);  Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 349 (1st Cir. 2018) (requiring "a sufficient evidentiary showing that her protected whistleblowing activity was a but-for cause of her dismissal" to survive summary judgment).

---

[24] As this Court has previously noted the judicial remedy for a violation of the MWPA is a cause of action under the MHRA.  Nonetheless, "the prevailing case law . . . outlines different standards for evaluating retaliation claims based on statutorily defined [MWPA] whistleblowing activity on the one hand and general opposition to practices in violation of the MHRA on the other."  Charette v. St. John Valley Soil & Water Conservation Dist., 332 F. Supp. 3d 316, 356 n. 40 & 41 (D. Me. 2018).

Viewing the record in the light most favorable to Plaintiff, a factfinder could conclude that DiGiacomo would not have resigned but-for the retaliation she experienced in the Spring of 2015; specifically, the incidents in which she was being called a "rat" by inmates and, as a result, began to fear for her personal safety. This conclusion is further bolstered by the temporal proximity between the written complaint letter she presented to Campbell on March 24, 2015 and the complaints from fellow officers that followed.

On the record presented, Plaintiff has trialworthy retaliation claims. Therefore, the Court DENIES the request for summary judgment as to Counts V & VI as to Kennebec County.

### c. Statutory Discrimination Claims

Defendants also seek summary judgment on Plaintiff's discrimination claims, which include (1) discrimination based on sexual orientation in violation of the Maine Human Rights Act ("MHRA"), 5 M.R.S.A. § 4572(1)(A) (Count IV), (2) discrimination based on religion in violation of Title VII and the MHRA (Count IV), (3) discrimination based on gender in violation of Title VII and the MHRA (Count VIII), (4) sexual harassment in violation of Title VII and the MHRA (Count X), and (5) hostile work environment in violation of Title VII and the MHRA (Count X).[25]

### 1. Hostile Work Environment Claim (Count X)

The Court first focuses its attention on the hostile work environment claim.[26] To prevail on a claim for hostile work environment, "the plaintiff must show: (1) she is a member of a

---

[25] To the extent Plaintiff states claims under both the applicable federal and state statutes, the Court need not engage in separate analysis of the federal and state claims. See, e.g., Roy, 914 F.3d at 62 ("A hostile work environment claim under the MHRA is concurrent with Title VII.") (internal citation and quotation omitted); Carnicella v. Mercy Hosp., 168 A.3d 768, 774 n.3 (Me. 2017) ("Because the MHRA generally tracks federal anti-discrimination statutes, it is appropriate to look to federal precedent for guidance in interpreting the MHRA.") (internal citation and quotation omitted).

[26] The Court construes this claim for hostile work environment as applying to DiGiacomo's gender, religion, and sexual orientation. Notably, Defendants agree that the same standard applies regardless of what protected class Plaintiff invokes and does not seek to distinguish the claims based on DiGiacomo's various protected classes. See Def. Mot. (ECF No. 13), PageID #s 236-237.

protected class; (2) she was subject to harassment; (3) the harassment was based on her membership in a protected class; (4) the harassment was sufficiently severe or pervasive so as to alter the conditions of her employment and create an abusive work environment; (5) the harassment was both objectively and subjectively offensive; and (6) there exists some basis for employer liability." Flood v. Bank of Am. Corp., 780 F.3d 1, 10 (1st Cir. 2015). Here, Defendants seek summary judgment arguing a lack of admissible evidence to satisfy the fourth and fifth prongs.

"In assessing whether conduct is severe or pervasive and both objectively and subjectively offensive, [a court] evaluate[s] 'the severity of the conduct, its frequency, whether it is physically threatening or not, and whether it interfered with the victim's work performance." Xiaoyan Tang v. Citizens Bank, N.A., 821 F.3d 206, 217 (1st Cir. 2016) (internal quotations and citations omitted). "There is no mathematically precise text . . . [but] numerous factors (to which we assign no particular determinative weight) [including] severity of the discriminatory conduct, its frequency, the extent to which the behavior is physically threatening or humiliating as opposed to a mere offensive utterance, and the extent to which it unreasonably interferes with an employee's work performance." Franchina v. City of Providence, 881 F.3d 32, 46 (1st Cir. 2018). While a plaintiff is only required to produce trialworthy evidence as to severity or pervasiveness, "[p]ervasiveness and severity are questions of fact." Flood, 780 F.3d at 11. "Properly applied," the standards for determining whether a working environment was hostile, "will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (quotation marks omitted). However, as the First Circuit explained in Flood, "subject to some policing at the outer bounds, it is for the jury to . . . decide whether the harassment

was of a kind or to a degree that a reasonable person would have felt that it affected the conditions of her employment." <u>Flood</u>, 780 F.3d at 11 (internal quotations omitted).

Here, some of the comments and behavior documented by DiGiacomo could be categorized as "the ordinary tribulations of the workplace." <u>Faragher</u>, 524 U.S. at 788. However, the more egregious comments, including Rocque's shower comment, the incident in which Underwood referred to himself as a "sexy piece of chocolate," and Underwood's calling DiGiacomo a "whiny bitch" just a few weeks later, all rise to requisite level of severity to allow DiGiacomo's hostile work environment claim to survive summary judgment. <u>See, e.g.</u>, <u>Roy</u>, 914 F.3d 52, 63 (1st Cir. 2019) (concluding that the use of "gender-specific epithets" can be considered evidence of sexual harassment regardless of the subjective motivations of the speaker). Additionally, viewing the evidence in the light most favorable to Plaintiff, a factfinder could conclude that her co-workers ignored her requests that they cease such offensive behavior and that the harassment occurred on a daily basis thereby making it pervasive.

The Court recognizes that the bar for constructive discharge is higher than the bar for a basic hostile work environment claim. <u>See</u> <u>Marrero v. Goya of Puerto Rico, Inc.</u>, 304 F.3d 7, 28 (1st Cir. 2002) ("[T]he fact that the plaintiff endured a hostile work environment—without more—will not always support a finding of constructive discharge.") The Supreme Court has recognized that "[a] hostile-environment constructive discharge claim entails something more: A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign." <u>Pennsylvania State Police v. Suders</u>, 542 U.S. 129, 147 (2004). At trial, a factfinder may conclude that Plaintiff cannot meet this high bar and that Plaintiff's constructive discharge is causally connected only to her retaliation claim and not to this claim for hostile work environment. However, as the First Circuit recently explained in <u>Roy</u>, when

a plaintiff presents a record that is replete with behavior that could have been motivated by discrimination and/or retaliation, the issue of whether such behavior can be attributed to retaliation or a particular type of discrimination "is an issue for the jury." Roy, 914 F.3d 52, 63-64.

Mindful that the Court's role is "merely to referee at the outer bounds," the Court believes Plaintiff has put forward sufficient evidence to bring her hostile work environment claim within the bounds of trialworthiness. Rivera-Rivera, 898 F.3d at 93 (internal quotations and citations omitted). As a result, the Court DENIES the request for summary judgment as to Count IX.

### 2. Other Discriminatory Disparate Treatment Claims (Counts IV & X)

Defendants do not individually address each of the remaining four discrimination claims, which they frame as alleging discriminatory disparate treatment. Notably, Plaintiff does not appear to dispute this characterization. As to this latter group of discrimination claims, Defendants argue the Court should look at DiGiacomo's claims that she was treated differently based on her religion, gender and sexual orientation using the four-part test for a prima facie case: "(1) the plaintiff must be a member of a protected class; (2) she must be qualified for her job; (3) she must suffer an adverse employment action at the hands of her employer; and (4) there must be some evidence of a causal connection between her membership in a protected class and the adverse employment action." Bhatti v. Trustees of Boston Univ., 659 F.3d 64, 70 (1st Cir. 2011). Incorporating the Court's earlier analysis of constructive discharge as a trialworthy adverse action, Defendants' remaining assertion is that Plaintiff cannot establish the required causal connection between her constructive discharge and her religion, gender, or sexual orientation.

The Court disagrees. In the Court's assessment, Plaintiff has put forward circumstantial evidence that her complaints were handled differently because of some or all of the protected classes of which she is a member. In the Court's view, one key piece of circumstantial evidence

that creates a trialworthy disparate treatment claim is Kennebec County's handling of the Pierce investigation in January 2016. Juxtaposing the County's handling of DiGiacomo's well-documented complaints of harassment and the County's handling of Pierce's complaints, a reasonable factfinder might conclude that the County took a dismissive or lackadaisical approach to DiGiacomo's complaints; and, by contrast, took a more serious approach to the Pierce complaints. With the benefit of being able to weigh the credibility of all of the witnesses involved, a factfinder might conclude the different approaches reflect disparate treatment based on either sexual orientation or religion.[27] To be clear, a factfinder might not reach this conclusion. However, in reply to Plaintiff's reliance on the Pierce investigation, Defendants have only asked the Court to disregard the later investigation as irrelevant, and have not offered any explanation regarding why the complaints were handled differently.

Viewing the entire record in the light most favorable to DiGiacomo, there is sufficient evidence from which a factfinder could conclude that DiGiacomo resigned because KCCF management deemed DiGiacomo's complaints as unworthy of serious investigation or discipline. On this basis, the Court concludes Counts IV & X survive summary judgment.

### 3. The Discrimination in Intake Training Claim (Count VIII)

Defendants separately argue for summary judgment on Plaintiff's assertion that KCCF denied women equal opportunities to be trained in the intake process. Looking at the Amended Complaint, the Court reads Count VIII to focus solely on KCCF Intake as a standalone disparate treatment claim. The Court readily concludes that Defendants are entitled to summary judgment on this particular gender discrimination claim as Plaintiff has presented no evidence to support the

---

[27] Because Pierce was a woman also complaining of sexual harassment, it stands to reason that gender cannot explain the apparent differences in the handling of the complaints.

claim. Reaching into the record, the Court has found only one email that documents DiGiacomo complaining to Briggs about not getting trained on intake and speculating that one reason Cyr would not train her on Intake was because she was female. See Garmon v. Nat'l R.R. Passenger Corp., 844 F.3d 307, 316 (1st Cir. 2016) (affirming summary judgment on racial disparate treatment claims and noting that a plaintiff's "own say-so . . . is insufficient to meet [the] burden of establishing a prima facie case" on a disparate treatment claim). However, the undisputed evidence proffered by Defendants is that women were approximately a third of the 73 people trained on Intake between 2010 and 2016, which is in line with the overall percentage of women in KCCF's workforce during that same period. (See Defs. Mot., PageID # 234.)

Therefore, the Court GRANTS summary judgment in favor of Defendants on Count VIII.


## III.    CONCLUSION

For the reasons just stated, the Court hereby GRANTS IN PART and DENIES IN PART Defendants' Motion for Judgment on the Pleadings and for Summary Judgment (ECF No. 13). To summarize, judgment shall be entered in favor of the Individual Defendants on all claims and for the Kennebec County Defendants on Counts VIII, XI, XIII, XIV, XV, XVI. Plaintiff's claims for retaliation and discrimination against the Kennebec County Defendants, as stated in Counts IV, V, VI, IX, X, shall be placed on the next available trial list.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 19th day of March, 2019.